IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| WHALEWISDOM, LLC and DANIEL COLLINS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 2:16-cv-0028-CLC-MCLC |
| BRENT PLUNKETT, | ) ) | |
| Defendant. | ) ) | |

## BRIEF IN SUPPORT OF DEFENDANT'S AMENDED MOTION FOR JUDGMENT ON THE PLEADINGS

NOW COMES Defendant Brent Plunkett by and through undersigned counsel, and pursuant to LR7.1(a), submits this brief in support of his Amended Motion for Judgment on the Pleadings.

## SUMMARY

The questions before the Court are (1) whether an agreement signed by Plaintiff Daniel Collins ("Collins") and Defendant Brent Plunkett ("Plunkett") is sufficiently unambiguous to entitle Plunkett to judgment on any claims raised by Plaintiffs' Complaint or by Plunkett's Counterclaim, and (2) even if that agreement contains ambiguity, whether Plaintiffs' claims of declaratory judgment and rescission can withstand a Rule 12 challenge. As argued herein, the written agreement signed by both Collins and Plunkett is unambiguous, and its terms undermine Plaintiffs' allegations and claims. Furthermore, the plain language of the agreement supports judgment in favor of Plunkett as to his claims for declaratory judgment and breach of contract.

Accordingly, Plunkett respectfully requests the Court grant judgment on the pleadings in his favor.

## FACTS

Plaintiff WhaleWisdom, LLC ("Whale Wisdom" or the "Company") operates a Website, www.whalewisdom.com (the "Website"), on which its customers may observe the stock movements of well known money managers. (Compl. ¶ 6). Collins started an iteration of Whale Wisdom in 2008, and formed Whale Wisdom in 2013 using Legal Zoom. (Counterclaim ¶ 58(a); Answer ("Ans.") ¶ 58(a)). In 2014, Defendant Brent Plunkett ("Plunkett"), a user of the Website, expressed interest to Collins regarding becoming a member/part-owner of Whale Wisdom. (*Id.* ¶ 10). Collins expressed interested in bringing on a potential partner that could help further grow Whale Wisdom and the Website and to serve as the public face of the Company. (*Id.* ¶ 11). Collins informed Plunkett other people had approached him inquisitive about the Website, including reporters from companies such as Forbes and CNN, but that he had shied away from such advances due to his lack of industry experience. (Counterclaim ¶ 14; Ans. ¶ 14). Plunkett responded by informing Collins he had the industry experience necessary to fulfill what Collins needed and to help ensure the Website's future success. (Counterclaim ¶ 13; Ans. ¶ 13).

Negotiations ensued, and Plunkett and Collins then began discussing the terms and conditions of Plunkett becoming a member and part-owner of the Company. (Compl. ¶ 12; Counterclaim ¶ 16; Ans. ¶ 16). Specifically, Plunkett proffered that he could be the "face" of the Company, create a marketing strategy for the company, bring ideas for proprietary products, and improving the data available through the Website by implementing standard industry practices. (Counterclaim ¶ 16; Ans. ¶ 16). Among the proprietary products Plunkett shared with Collins was the idea for a "Whale Score" and "Whale Index." These would provide users of the Website

with a rating system of hedge funds and provide an educational tool based on hedge fund performance. (Counterclaim ¶ 17; Ans. ¶ 17).

In exchange for this participation, Plunkett wanted to be 49% owner of Whale Wisdom. (Counterclaim ¶¶ 19-20, **Exhibit 1**[1]; Ans. ¶ 19). Collins and Plunkett then began negotiating the financial particulars that would be incorporated into an agreement, including the purchase price for this ownership interest and minimum revenue goals that would protect Collins by allowing him terminate Plunkett's ownership interest if the Company did not meet those revenue goals. (Counterclaim ¶ 18; Ans. ¶ 18). On May 2, 2014, Plunkett sent an email to Collins in which Plunkett proposed a way to structure a partnership agreement. (Ans. ¶ 19; Counterclaim **Exhibit 1**). In that email, Plunkett proposed Collins sell 49% of the Company to Plunkett for $159,250, payable over a five year period by applying Plunkett's ultimate membership interest to the first $65,000 in annual company profit, stating:

> Sell me 49% of the entire business that would be $159,250. Which I think would be best handled through an earn out over 5 years or something like we previously discussed. Meaning you continue to make the base $65,000 from the business until my $159,250 is earned by you (49% of $65k over 5 years) and we split any profit over $65k at 51/49 percent."

**Exhibit 1**. Plunkett further proposed certain revenue hurdles that would allow Collins to terminate the Agreement, stating "if I am not adding value I should be out." (*Id.*).

These discussions culminated in the execution of an agreement on July 1, 2014, drafted by Plunkett (the "Agreement"). (*Id.* ¶¶ 13-14 Ex. A[2]). With the exception of a $3,250 increase in the purchase price, the Agreement tracked the offer made by Plunkett on May 2, 2014, stating in part:

---

[1] For ease of reference, **Exhibit 1** to the Counterclaim is also attached as **Exhibit 1** hereto.
[2] For ease of reference, attached as **Exhibit 2** is a true and accurate copy of the Agreement, which Plaintiffs with the state court as an exhibit to the Complaint. [D.E. #1, Ex. 2].

In consideration for the 49% ownership in Whalewisdom LCC Brent will pay Daniel $162,500 which will be paid through the revenues generated by the company beginning July 1, 2014 and ending June 30, 2019. Daniel will retain profits of $65,000 annually before any additional annual profits are distributed pursuant to the ownership percentages. If annual profits do not total $65,000 in any one year the shortage will be added on to the following year amount owed to Daniel before additional profits are paid out.

…

Brent will be deemed to be fully vested in his ownership of the company once Daniel has received the full purchase amount of $162,500 by June 30th, 2019 or if Brent pays the balance off prior to that date. Once Brent is fully vested in his ownership percentage all profits are paid out according to the ownership percentages. Each year that Daniel collects the $65,000 Brent will become a 9.8% vested in Whalewisdom LLC.

**Exhibit 2**.

After Plunkett joined Whale Wisdom, the Company grew rapidly, netting $54,875.00 in profit from July 1, 2014 through December 31, 2014, (Compl. ¶ 9), a direct result of Plunkett's immediate contributions to the Company. During this time, Plunkett suggested changes to the Website's end-user interface, took responsibility for business development, created the Whale Score, recommended a vendor to help improve the Website data (which end-users used for investment strategies), oversaw updates to the Company and Website logo redesign, and advised Collins that collection of end-user data would enable the Company to better market the Website by growing the subscriber base, thereby growing the Company's profitability. (Counterclaim ¶¶ 32-38; Ans. ¶¶ 32-38). Despite the profits resulting from Collins' and Plunkett's efforts, Whale Wisdom made no distribution to its members at the end of 2014. (Compl. ¶ 18).

Plunkett's efforts on behalf of the Company only grew in 2015. Together, Plunkett and Collins launched a redesigned Website, new company logo, and the Whale Score and Whale Index. Plunkett also began writing for a national publication on behalf of the Company, attended

industry conferences, and continued to advise Collins on improving the Website's data. (Counterclaim ¶¶ 40-44; Ans. ¶¶ 40-44). Because of the continued improvements resulting from Plunkett and Collins' efforts, the Website saw continued growth, and the Company became more profitable. (Counterclaim ¶ 41; Ans. ¶ 41).

As the 2015 calendar year was coming to a close, on November 30, 2015, Plunkett emailed Collins to inquire about the company's profitability from July 1, 2014 through the end of calendar year 2015, (Counterclaim ¶ 49; Ans. ¶ 49), and requesting Collins send him a distribution check after the year end numbers were determined. (Compl. ¶ 20). In response to Plunkett's email, Collins indicated he believed that the Agreement entitled him to keep all of the first $65,000 of annual profit, and that Plunkett's payment of the purchase price was to be derived from any annual profit above $65,000, as any profit realized beyond the first $65,000 would then "be split between the parties according to their eventual ownership percentages (51% to Collins and 49% to Plunkett)." (Compl. ¶ 23; Counterclaim ¶ 49; Ans. ¶ 49). Plunkett disagreed with Collins, asserting the Agreement expressed that 49% of the first $65,000 of profit would be applied to the $162,500 purchase price, and that any profit beyond $65,000 would be distributed pursuant to the ownership percentages. (Compl. ¶ 24; Counterclaim ¶ 49; Ans. ¶ 49).

In an effort to avoid further dispute, Plunkett then attempted to exercise his pre-payment option under the Agreement. (Counterclaim ¶ 51; Ans. ¶ 51). Collins refused, in part on grounds he believed (and believes) no such pre-payment right exists under the Agreement. (Counterclaim ¶ 52; Ans. ¶ 52).

Collins and Plunkett have been unable to resolve their respective interpretations of the Agreement, and on January 12, 2016, Collins and Whale Wisdom sued Plunkett in Tennessee state court. In addition to the allegations summarized above, Plaintiffs allege Collins would have

not entered into the Agreement "on the terms Plunkett now asserts the Agreement expresses," and that accordingly the "Agreement does not reflect a meeting of the minds in a mutual assent to terms." (Compl. ¶¶ 25-26). Plaintiffs also allege the Agreement is ambiguous and subject to more than one reasonable interpretation. (*Id.* ¶ 27). Based on these allegations, Plaintiffs seek to have the Agreement rescinded, with Collins retaining full ownership of Whale Wisdom, and Plunkett and Collins each compensated according to the fair value of their labor for Whale Wisdom. (*Id.* ¶ 29). Alternatively, Plaintiffs bring a count titled "Declaratory Judgment," which requests the Agreement be construed in favor of Collins as he is the non-drafting party. (*Id.* ¶ 31). Plaintiffs' prayer for relief appears to seek a broader declaratory judgment, specifically "that the Court determine and declare the proper interpretation of the Agreement, including the present ownership of Whalewisdom, LLC and the share of profits owed to each party [sic]." (*Id.*, Prayer, ¶ 3).

Pursuant to 28 U.S.C. § 1332(a), on February 12, 2016, Plunkett removed the state court action to this Court. [D.E. #1]. Plunkett then filed a Motion for Judgment on the Pleadings [D.E. # 10] as well as his Answer and Counterclaim. [D.E. # 16], bringing claims for declaratory judgment that the Agreement is enforceable, that he is a member of the Company, and that he has the right to pay any and all of the purchase price set forth in the Agreement at any time. (Counterclaim ¶¶ 60-63). Plunkett also brings a breach of contract claim, alleging that Collins has collected distributions to which he should have applied the 49% figure found in the Agreement and applied such monies towards Plunkett's purchase price as required by the Agreement, but that Collins has failed to do so. Plunkett further alleges Collins has breached the Agreement by refusing to allow Plunkett to pre-pay, despite Plunkett's right to do so under the Agreement. (*Id.* ¶¶ 67-81).

Plaintiffs answered Plunkett's Counterclaim on March 10, 2016, admitting the majority of Plunkett's allegations concerning Plunkett's involvement in and efforts on behalf of Whale Wisdom, and further admitting that these efforts made the company more profitable. (Counterclaim ¶ 41; Ans. ¶ 41). Plaintiffs' Answer to Plunkett's Counterclaim also contradicted Plaintiff's Complaint as (1) Collins impliedly alleged in his Complaint that he executed an Operating Agreement, (Comp. ¶¶ 7, 19), but now admits that he never executed an operating agreement for Whale Wisdom. (Counterclaim ¶ 58(a); Ans. ¶ 58(a)); and (2) Collins alleged in his Complaint that from July 1, 2014 through December 31, 2015, he took no distributions from the Company (Compl. ¶ 18), but now admits he has taken an annual distribution of $65,000. (Counterclaim ¶ 79; Ans. ¶ 79). While denying Plunkett's right to declaratory judgment and denying Collins breached the Agreement, Plaintiffs raise <u>no</u> affirmative defenses in their Answer.

With leave of Court and consent from Plaintiffs, Plunkett now amends his motion for judgment on the pleadings and, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeks judgment as to all claims found in Plaintiffs' Complaint and his Counterclaim as no material issue of fact exists, entitling Plunkett to judgment as a matter of law.

## LEGAL GROUNDS

While inartfully drafted, the Agreement between Plunkett and Collins lacks any ambiguity and is subject to only one interpretation: that espoused by Plunkett. The Agreement's inclusion of a provision stating "Each year that Daniel [Collins] collects the $65,000 Brent [Plunkett] will become a 9.8% vested in Whalewisdom LLC," and the mathematical equation supporting this percentage (applying 49% – Plunkett's ultimate membership interest – to the first $65,000 of Company profit over the five (5) year period expressed in the Agreement) eliminates

any other reading of the Agreement. Further, the Agreement expressly provides Plunkett a pre-payment right allowing him to pay any or all of the $162,500 purchase price at any time. Since this Court can interpret the Agreement as a matter of law, and as all claims in this action can be disposed of by the plain language of that Agreement and the admissions of Plaintiffs, Plunkett respectfully requests the Court enter judgment on the pleadings in his favor. Even if the Agreement were ambiguous, rescission is not an available remedy to Plaintiffs, nor does the contractual canon that an agreement be construed against the drafter create a dispositive remedy for Plaintiffs, and Plunkett requests dismissal of Plaintiffs' claims.

### A.   Standard of Review.

A motion for judgment on the pleadings is brought under Rule 12(c), which provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment. A motion brought pursuant to Rule 12(c) is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Coyer v. HSBC Mortg. Servs., Inc.,* 701 F.3d 1104, 1107–08 (6th Cir. 2012) (citations omitted). Review of a Rule 12(c) motion is the same as for a motion brought under Rule 12(b)(6). *Jelovsek v. Bredesen,* 545 F.3d 431, 434 (6th Cir. 2008).

Under Rule 12(c), " 'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claims.' " *Hira v. New York Life Ins. Co.,* No. 3:12-CV-373, 2014 WL 2177799, at *6 (E.D. Tenn. May 23, 2014) (quoting *Gibson v. Mortg. Elec. Registration Sys., Inc.,* No. 11–

2173–STA, 2012 WL 517329, at \*3 (W.D. Tenn. Feb.15, 2012)). Such documents are not required to be attached or incorporated, but instead, referenced and central to a plaintiff's claims. *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). Documents attached to the pleadings may be considered by the Court without turning the Rule 12 motion into a motion for summary judgment. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 335–36 (6th Cir.2007).

### B.      The Agreement is an Enforceable Contract.

The entirety of Plaintiffs' argument appears to be that "Plunkett and Collins each had differing understandings of the material terms of the Agreements [sic] such that there was never a meeting of their minds as to the essence of the Agreement." (Compl. ¶ 22). From this, Plaintiffs argue the Agreement "does not reflect a meeting of the minds in a mutual assent to terms," (*Id.* ¶ 26), and by way of extension, that the Agreement cannot be enforced and should be rescinded. (*Id.* ¶¶ 28-29). Plaintiffs' legal theory is far-fetched.

"An enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." Rice v. N.N. Inc., Ball & Roller Div., 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006) "[O]ne of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 566 (Tenn.Ct.App.1990). Only absence of an <u>essential</u> element "may prevent the creation of an enforceable contract." *Seramur v. Life Care Ctrs. of Am., Inc*., No. E2008–01364–COA–R3–CV, 2009 WL 890885, at \*2 (Tenn. Ct. App. Apr.2, 2009) (emphasis added). However, "[d]estruction of contracts because of uncertainty has never been favored by the law." *Gurley v. King*, 183 S.W.3d 30, 34 (Tenn. Ct. App. 2005). It follows that "a party cannot rely on an objectively unreasonable interpretation of

an agreement to support its claim that there was no meeting of the minds." *Behr Sys., Inc. v. Envirometric Process Controls, Inc.*, 65 F. App'x 3, 14 (6th Cir. 2003).

At the outset, the <u>entirety</u> of Plaintiffs' argument focuses on <u>one</u> term of the Agreement: whether a portion of Plunkett's purchase price is to be paid from the first $65,000 of annual company profit realized by Whale Wisdom. Plaintiffs do not claim a misunderstanding or a lack of a "meeting of the minds" as to how much Plunkett would pay ($162,500), by when Plunkett was to pay this amount by (June 30, 2019) or what Plunkett would get in return (49% ownership in Whalewisdom, LLC). Likewise, Plaintiffs do not claim there was any misunderstanding to the Agreement's language that states "Brent will be deemed to be fully vested in his ownership of the company once Daniel has received the full purchase amount of $162,500 by June 30th, 2019 <u>or if Brent pays the balance off prior to that date</u>." **<u>Exhibit 1</u>** (emphasis added). In other words, Plaintiffs' claims for unenforceability and rescission require the Court to *ignore* that Collins and Plunkett agreed to all "essential" terms, and instead to find that a purported ambiguity with respect to a *how* Plunkett would pay the purchase price under the Agreement is sufficient to destroy the parties' Agreement. Even if Plaintiff's claims as to this provision were true – which, as detailed below, they are not – this still does not vitiate the Agreement's enforceability as Plunkett and Collins agreed, in writing, to sufficient terms to create a contract. Plaintiffs' overarching allegation that the Agreement is unenforceable is baseless.

## C.  **<u>The Payment Provision of the Agreement is Unambiguous and Therefore Can Be Interpreted as a Matter of Law.</u>**

Plaintiffs' argument that the payment provision of the Agreement is ambiguous similarly strains logic. While Collins may not favor this term, it is unambiguous and may be interpreted as a matter of law by this Court, therefore making this proceeding ripe for judgment on the

pleadings. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983).[3]

"In interpreting contracts in Tennessee, the Tennessee Supreme Court has explained:

> A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties. Courts must look to the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls; however, if the words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. In such circumstances, the court must apply established rules of construction to determine the intent of the parties.

*Moran Indus., Inc. v. Mr. Transmission of Chattanooga, Inc.*, 725 F. Supp. 2d 712, 717 (E.D. Tenn. 2010) (quoting *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. Sup. Ct.2009)) (internal quotations omitted). "Contractual language 'is ambiguous <u>only</u> when it is of uncertain meaning and may fairly be understood in more ways than one.' " *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. Sup. Ct. 2006) (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. Sup. Ct. 1975)). Contracts must be construed so as to give effect to every term. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. App. 1996). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975). Further, "[a] contract is not rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions." *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n. 5 (Tenn. Ct. App. 2000).

_____

[3] Tennessee substantive law applies to this action. In a diversity action, state substantive law governs. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). A federal district court is required to apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Tennessee follows the rule of *lex loci contractus*, which provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999). While not alleged, the Agreement indicates Collins was the last to execute. As Collins resides in Tennessee, its state substantive law applies.

**1.      There is only one reasonable interpretation of the payment provision.**

The payment provision at issue states:

> In consideration for the 49% ownership in Whalewisdom LCC Brent will pay Daniel $162,500 which will be paid through the revenues generated by the company beginning July 1, 2014 and ending June 30, 2019. Daniel will retain profits of $65,000 annually before any additional annual profits are distributed pursuant to the ownership percentages. If annual profits do not total $65,000 in any one year the shortage will be added on to the following year amount owed to Daniel before additional profits are paid out.
> …
> Brent will be deemed to be fully vested in his ownership of the company once Daniel has received the full purchase amount of $162,500 by June 30th, 2019 or if Brent pays the balance off prior to that date. Once Brent is fully vested in his ownership percentage all profits are paid out according to the ownership percentages. Each year that Daniel collects the $65,000 Brent will become a 9.8% vested in Whalewisdom LLC.

**Exhibit 2**.

Read as a whole, and in context with the Agreement (as well as the May 2, 2014 email laying out this framework), this payment provision is subject to only one reasonable interpretation: with respect to payment through Company profit[4], Plunkett's payment of the $162,500 purchase price is achieved through Collins' retention of the first $65,000 in annual Company profit, and 49% (Plunkett's ultimate membership interest) of that profit being applied to Plunkett's purchase price.

No clearer example of this is the Agreement's unequivocal statement "**Each year that Daniel [Collins] collects the $65,000 Brent will become 9.8% vested in Whalewisdom, LLC.**" **Exhibit 2** (emphasis added). For any portion of Plunkett's membership to "vest," Plunkett would have to pay Collins a portion of the purchase price. If a portion of the first $65,000 of annual profit collected by Collins was not applied to the purchase price, Plunkett could fully "vest" in membership without ever paying anything towards his purchase price. Such

---

[4] As described herein, Plunkett also had the ability to pay the purchase price at any time.

a conclusion not only defies common sense, but also requires ignoring another term of the Agreement: "Brent will be deemed to be fully vested in his ownership of the company once Daniel has received the full purchase amount of $162,500." *Cf. Wilson*, 929 S.W.2d at 373 (holding that contracts must be construed so as to give effect to every term). Giving every term in the Agreement meaning results in only one reasonable interpretation of the Agreement.

The fact that the Agreement requires 49% of the first $65,000 of the Company's annual profit to be applied to Plunkett's purchase price is further supported by the mathematics intrinsic in the Agreement. The Agreement states that Plunkett "will pay [Collins] $162,500 which will be paid through the revenues generated by the company beginning July 1, 2014 and ending June 30, 2019." Applying Plunkett's 49% equity interest to the first $65,000 of annual profit results in an annual payment to Collins of $31,850. Over the five year period <u>specified</u> by the Agreement, this amount totals $159,250 – the same figure discussed by Plunkett and Collins pre-Agreement. *See* **<u>Exhibit 1</u>**. Using this figure, each annual installment equates to 20% of the purchase price, and a **<u>9.8% equity interest for Plunkett</u>** – **<u>the same amount listed in the Agreement</u>**, as explained in the following chart:

| Portion of Purchase Price Paid Through Revenues: | $159,250 | | |
|---|---|---|---|
| Equity Percentage: | 49% | | |
| | | | |
| Profit | 49% | % of $159,250 | % of 49% ownership |
| $65,000 | $ 31,850.00 | 20.0% | 9.8% |
| $65,000 | $ 31,850.00 | 20.0% | 9.8% |
| $65,000 | $ 31,850.00 | 20.0% | 9.8% |
| $65,000 | $ 31,850.00 | 20.0% | 9.8% |
| $65,000 | $ 31,850.00 | 20.0% | 9.8% |

In other words, the Agreement plainly states that Plunkett will pay the purchase price "through the revenues generated" (with no limitation or other indication that this did not apply to the first $65,000 in annual Company profit), that Plunkett will pay the purchase price in five years, and that Plunkett becomes a 9.8% owner of Whale Wisdom for each year that $65,000 of profit is achieved. It then confirms this plain reading through the application of simple math as demonstrated in the above table.[5]

This reading of the Agreement is also consistent with other provisions found in the Agreement. For instance, the Agreement states "Brent will pay Daniel $162,500 which will be paid *through the revenues generated by the company* beginning July 1, 2014 and ending June 30, 2019." There is no carve-out language in this provision stating payment will be through revenues above and beyond $65,000; instead, it makes clear payment is through all revenues generated. Additionally, the Agreement states profits in excess of $65,000 would be "*distributed* pursuant to the ownership percentages," as opposed to *applied* to the purchase price or *paid* to Collins. The Agreement also states "if annual profits do not total $65,000 in any one year the shortage will be added on the following year amount owed to Daniel [Collins] before *additional profits are paid out*." (emphasis added). The Agreement's use of "distributed" and "paid out" in these provisions indicate that Plunkett's percentage share of profits above the first $65,000 are not to be *applied* to the purchase price, but instead treated as a normal member distribution, which, as Collins puts it in the Complaint, are paid "according to [the] eventual ownership percentages (51% to Collins and 49% to Plunkett)." (Compl. ¶ 23).

_____

[5] The only arguable ambiguity in this transaction is why Plunkett did not update this equation when the purchase price changed from $159,250 (*see* **Exhibit 1**) to $162,500. *See* **Exhibit 2**. This, however, does not create ambiguity in the Agreement, or form a basis for Collins to claim he had a different "belief" about what the Agreement said.

Plunkett's reading of the Agreement is also consistent with his pre-payment rights. Under the Agreement, Plunkett has two options: (1) he can pay through revenues generated vis-à-vis 49% of the first $65,000 of annual Company profit, or (2) <u>at any time</u>, he can pay off whatever balance of the $162,500 exists. If the first $65,000 of annual profit was to be retained by Collins for each of the five years of the payment schedule (and not applied to Plunkett's $162,500 payment), then, for instance, an immediate pre-payment by Plunkett of the entire amount would eliminate $325,000 of distributions to Collins. It strains credulity that Collins would be willing to forego gains in excess of double Plunkett's purchase price, further indicating that Collins' retention of the initial $65,000 of annual Company profit serves as the source of Plunkett's "[payment] through revenues generated."

While beyond the four corners of the Agreement, Plunkett's reading is also consistent with both the May 2, 2014 email exchange between Plunkett and Collins, in which Plunkett previewed and explained the payment provision found in the Agreement, and the factual chronology that followed execution of the Agreement, specifically that Plunkett was treated like a member in that he drew no salary and had only an expectation of distribution (and pay-down on his purchase price. (*See* Compl. ¶ 18). Only when the time came to pay Plunkett did Collins decide the Agreement was ambiguous and unenforceable, and thus that Plunkett was in fact not a member.

Such behavior smacks of a lack of good faith and fair dealing. The Agreement between Plunkett and Collins is enforceable, and its payment provision is subject to only one reasonable interpretation and therefore unambiguous.

2. **Plaintiffs' reading of the Agreement's payment provision is unsupported, requires ignoring provisions of the Agreement, and amounts to Collins being dissatisfied with the deal he struck.**

In contrast to Plunkett's reading, Plaintiffs' reading of the Agreement's payment provision strains credulity in an effort to find ambiguity. Taking Plaintiffs' allegations as true, Collins signed the Agreement "under belief that he would be entitled to retain $65,000 of annual profit, and profit in excess of $65,000 per year would be split" and that *that portion* of the profits "would be *retained* by the Company and *applied* toward [Plunkett's] purchase price." (Compl. ¶ 23) (emphasis added). Such a reading is contrary to the plain language of the Agreement, and requires ignoring other provisions of the Agreement. Plaintiffs' Complaint makes clear what Plaintiffs desire – for the Court to ignore all portions of the Agreement save for these two sentences: "In consideration for the 49% ownership in Whalewisdom LCC Brent will pay Daniel $162,500 which will be paid through the revenues generated by the company beginning July 1, 2014 and ending June 30, 2019. Daniel will retain profits of $65,000 annually before any additional annual profits are distributed pursuant to the ownership percentages." (*See* Compl. ¶ 17). If this were the extent of Agreement's terms related to Plunkett's purchase of 49% of the company, Plaintiffs' allegation of ambiguity *might* be credible. Still, the Court would have to ignore the fact that this portion of the Agreement does not contain the "*retained/applied*" language Plaintiffs employ in Paragraph 23 of the Complaint, but contrarily says profits over the first $65,000 in annual profit are to be "*distributed.*" *See* **Exhibit 2**.

The Court would also have to ignore the payment schedule included in these sentences, namely that Plunkett would pay Collins through revenues generated ending June 30, 2019. How could the parties agree to payment through revenues through June 30, 2019 unless those revenues were <u>known</u>, for instance, such as applying the payment provisions to only the first

$65,000 in annual Company profit? How can Collins conform his reading to the Agreement's express language stating that each year Collins "collects the $65,000" of initial annual Company profit, Plunkett becomes a 9.8% owner of Whale Wisdom? How can it be a "reasonable interpretation" in the face of the Agreement's statement that the purchase price "will be paid through the revenues generated," but that annual profits in excess of $65,000 would be "distributed"? Simply put, any reading of the Agreement mirroring Collins's "belief" when signing the Agreement (Compl. ¶ 23) amounts to a "strained construction [which] may not be placed on the language used to find ambiguity where none exists." *See Farmers-Peoples Bank*, 519 S.W.2d at 805. The emails referenced by Collins in the Complaint and attached to Plunkett's Counterclaim further belie his asserted "belief," as during negotiations, Plunkett laid out the framework of how the Agreement would work: "**my $159,250 is earned by you (49% of $65k over 5 years) and we split any profit over $65k at 51/49 percent**." <u>**Exhibit 1**</u>. "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, <u>or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely</u>." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (emphasis added) (quoting *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F.Supp.2d 371, 405–06 (S.D.N.Y.2001)). Collins's allegations about his "belief" should be ignored, and if not, still contradict the parties' negotiations and the plain language of the Agreement, and fail to create ambiguity.

That Plunkett's membership interest only vested at 9.8% per year and did not fully vest until full payment of the purchase price likewise cannot serve as a basis for ambiguity. Indeed, Collins admits as much in the Complaint, stating that he suffered no confusion over *what amount* over the first $65,000 in annual profit should be "paid" or "distributed" or "split" to Plunkett:

that amount would be "split between the parties according to their *eventual* ownership percentages (51% to Collins and 49% to Plunkett)." (Id. ¶ 23). Applying Collins' logic to the quantifiable numbers in the Agreement, including that Plunkett becomes a 9.8% vested owner of the Company each year there is $65,000 in annual Company profit, again renders only one reasonable interpretation of the Agreement.

The only way Collins (or the Company) can profess the belief alleged in the Complaint would be due to Collins' failure to read the Agreement before signing it. However, any failure to read the Agreement does not render it ambiguous, just as it does not constitute mutual mistake; instead it only constitutes negligence on the part of Collins. *See Goulson v. YumA Brands, Inc.*, 283 F. App'x 374, 380 (6th Cir. 2008) (affirming district court's dismissal of rescission claim due to lack of mutual mistake, partially on grounds that the contract's plain terms contradicted plaintiff's understanding). Taking Collins' "belief" as true also requires ignoring that Plunkett forecasted the very model used in the Agreement in his May 2014 email: "*Sell me 49% of the entire business that would be $159,250. Which I think would be best handled through an earn out over 5 years or something like we previously discussed. Meaning you continue to make the base $65,000 from the business until my $159,250 is earned by you (49% of $65k over 5 years) and we split any profit over $65k at 51/49 percent.*" **Exhibit 2**.

That Collins now disagrees with the language used in the Agreement or wishes he had struck a different deal does not change this conclusion. *See International Flight Ctr.*, 45 S.W.3d at 570 n. 5. "The courts will not make a new contract for parties who have spoken for themselves, and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise." *Harper-Wittbrodt Auto. Grp., LLC v. Teague*, No. M200500203COAR3CV, 2006 WL 2706148, at *10 (Tenn. Ct. App. Sept. 20,

2006) (citing *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002)).

The Agreement's payment provision is unambiguous, and therefore may be interpreted by the Court as a matter of law. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). Only one reasonable reading of the Agreement exists: Plunkett's payment of the $162,500 purchase price is generated from applying 49% of the first $65,000 in annual Company profit to that purchase price, or by any other payment Plunkett decided to make. Plaintiffs' claims are without merit and should be dismissed, and as Plaintiffs lack any defense to Plunkett's counterclaims, judgment should be entered in favor of Plunkett.

**D.    Because the Agreement is Enforceable, and its Payment Provision is Unambiguous and Harmonious with Plunkett's Reading, Any Right to Declaratory Relief is in Favor of Plunkett.**

Since the Agreement is unambiguous, Plaintiffs' claims for declaratory judgment must fail, and declaratory judgment should be entered in favor of Plunkett. "The primary purpose of the Declaratory Judgment Act is 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations....' " *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000) (quoting Tenn. Code Ann. § 29–14–113). "[I]n order to maintain an action for a declaratory judgment a justiciable controversy must exist. For a controversy to be justiciable, a real question rather than a theoretical one must be presented and a legally protectable interest must be at stake." *Id.* (citations omitted).

Here, the only assertion by Plaintiffs supporting their request for declaratory relief is that the Agreement is ambiguous. (*See* Compl. ¶¶ 27-28, 31, Prayer ¶ 2-3). The lack of ambiguity in the Agreement therefore eliminates any basis for a "justiciable controversy" arising from the Complaint, and Plaintiffs' requests for declaratory relief should be denied and/or dismissed. Any

declaratory relief issued by the Court should favor Plunkett, and his reading of the Agreement, including (1) the Agreement is enforceable, (2) Plunkett is a member of Whalewisdom, LLC by virtue of the Agreement, and (3) Plunkett has the right to pay any and all of the purchase price set forth in the Agreement at any time.

### E. Even if the Agreement (or Any Part Thereof) Was Ambiguous, Rescission is Not an Available Remedy, and Plaintiffs Have Not Sufficiently Alleged a Rescission Claim.

Plaintiffs also seek rescission of the Agreement. As the Agreement, including its payment provision, is unambiguous, Plaintiff's claim fails. Yet even if the Agreement was susceptible to more than one reasonable interpretation, rescission is not available remedy and is not adequately pled by Plaintiffs as they can allege no more than unilateral error on the part of Collins. "Rescission is not favored in Tennessee." *Klosterman Dev't Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 631 (Tenn. Ct. App. 2002). "Under Tennessee law rescission is available on various grounds including, but not limited to, illegality of contract, fraud, misrepresentation, mutual mistake, and duress." *Kyes v. Baskin Auto Truck & Tractor, Inc.*, No. 06-2353, 2007 WL 6892327, at *7 (W.D. Tenn. Dec. 12, 2007) aff'd, 310 F. App'x 749 (6th Cir. 2009). While available in instances of mutual mistake, "the equitable remedy of rescission is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court and the court should exercise the discretion sparingly." *Id.* (citing *Vakil v. Idnani*, 748 S.W.2d 196, 199 (Tenn. Ct. App. 1987).

Plaintiffs seek rescission only for mutual mistake. When a plaintiff does not or cannot plead that the mistake was mutual and material, dismissal is appropriate. *See Robinson v. Brooks*, 577 S.W.2d 207, 209 (Tenn. Ct. App. 1978) (citing 17A C.J.S. *Contracts* § 418(2)). This is because, absent some additional equitable issue, " '[a] unilateral error . . . does not avoid a

contract.' " *Cofrancesco Const. Co. v. Superior Components, Inc.*, 52 Tenn. App. 88, 94, 371 S.W.2d 821, 824 (1963) (quoting 12 Am. Jur. *Contracts*, Sec. 133, p. 624). Even if a party were "were mistaken as to the terms of [a] contract when it was signed, [if] the mistake was not a mutual one, [ ] they are entitled to no relief for that reason." *Sudduth v. Storm King Coal Co.*, 268 F. 433, 437 (6th Cir. 1920).

Here, all Plaintiffs can allege (at best) is unilateral error, and Plaintiffs' Complaint therefore does not cannot allege mutual mistake, and thus cannot support a rescission claim. In fact, Plaintiff's Complaint supports only a finding that Collins did not read the Agreement before signing it. The Agreement plainly states "**[e]ach year that Daniel [Collins] collects the $65,000 Brent will become 9.8% vested in Whalewisdom, LLC**," and that profits above the first $65,000 of annual profit will be "distributed." **<u>Exhibit 2</u>** (emphasis added). This language does not support, and in fact contradicts to Collins' belief: that he could keep the first $65,000 in annual Company profit, and that Collins believed "[p]rofit in excess of $65,000 per year would be split between the parties" and "Plunkett's portion of the profits *would be retained by the Company and applied toward his purchase price*") (Compl. ¶ 23) (emphasis added). Collins' "belief" regarding the Agreement is belied by not only these provisions, but the other provisions discussed *supra*. Again, Collins' unilateral error in failing to read the Agreement does not constitute mutual mistake; instead it constitutes negligence on the part of Collins. *See Goulson* , 283 F. App'x at 380. No mutual mistake exists, and therefore Plaintiffs' rescission claim fails as a matter of law. *See Robinson*, 577 S.W.2d at 209.

In addition, even if mutual mistake to the payment provision did exist, it still does not entitled Plaintiffs to rescission, as Plaintiffs allege no mutual mistake to the overall purchase price, when that purchase price was to be paid, or what Plunkett would receive in return.

"Destruction of contracts because of uncertainty has never been favored by the law." *Gurley v. King*, 183 S.W.3d 30, 34 (Tenn. Ct. App. 2005). Plaintiffs' rescission claim should be dismissed.

      **F.**      **Plunkett is Entitled to Judgment as a Matter of Law on His Breach of Contract Claim.**

Plunkett is additionally entitled to judgment as a matter of law on his breach of contract claim. Plunkett's claim arises from three separate breaches. (Counterclaim ¶¶ 67-81). First, Collins now admits to taking distributions from the Company, and admits that he did not apply any portion of that distribution to Plunkett's purchase price. (Counterclaim ¶¶ 73, 79; Ans. ¶¶ 73, 79). As the Agreement is unambiguous in requiring Collins to apply 49% of the first $65,000 of annual Company profit distributed to him by Whale Wisdom – which he admits to not doing – Collins has breached the Agreement.

Second, Plunkett has attempted to exercise his pre-payment rights under the Agreement, which states "Brent will be deemed to be fully vested in his ownership of the company once Daniel has received the full purchase amount of $162,500 by June 30th, 2019 <u>or if Brent pays the balance off prior to that date</u>." **Exhibit 2** (emphasis added). Despite this unambiguous language, Collins has refused to accept any payment by Plunkett, in part on grounds he believed (and believes) no such pre-payment right exists under the Agreement. (Counterclaim ¶ 52; Ans. ¶ 52). This refusal constitutes another breach.

Plunkett's third basis for breach is that Whale Wisdom has been sufficiently profitable such that Collins should have made distributions to Plunkett, i.e. payment of 49% of annual profits above the first $65,000 of annual Company profit. Collins impliedly admits Whale Wisdom has made more than $65,000 for calendar year 2015, as he has had to "refrain from paying any distributions beyond an annual $65,000 to himself," not because of a lack of profit,

but because "Collins and Plunkett disagree [about] what amount is owed to Plunkett. (Counterclaim ¶ 79; Ans. ¶ 79). Collins failure to distribute 49% of the annual profit above $65,000 to Plunkett constitutes yet another breach.

Given the Agreement's lack of ambiguity and enforceability, and Collins' admissions, Plunkett moves for judgment in his favor for his breach of contract claim.

## CONCLUSION

For the foregoing reasons, Defendant Brent Plunkett respectfully requests the Court enter judgment on the pleadings in favor of Plunkett pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Respectfully submitted, this the 24th day of March, 2016.

/s/ Paul J. Puryear, Jr.
Paul J. Puryear, Jr. (NC State Bar No. 41536)[6]
ppuryear@wyrick.com
4101 Lake Boone Trail, Suite 300
Raleigh, North Carolina 27607
Telephone: 919.781.4000
Facsimile: 919.781.4865

Kenneth Clark Hood (B.P.R. #9995)
Laughlin Nunnally Hood & Crum, P.C.
100 South Main Street
Greenville, TN 37743
(423) 639-5183
Fax: (423) 798-9753

*ATTORNEYS FOR BRENT PLUNKETT*

---

[6] Admitted Pro Hac Vice.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify a copy of the foregoing was served on the following by filing the same with CM/ECF:

        Rebecca J. Ketchie
        John R. Graham
        Wilson Worley, P.C.
        2021 Meadowview Lane, 2nd Floor
        P.O. Box 88
        Kingsport, Tennessee 37662

This the 24th day of March, 2016.

                        s/ Paul J. Puryear, Jr.
                        Paul J. Puryear, Jr.